**SHELL OIL COMPANY, Plaintiff,**

**v.**

**Russell E. TRAIN and the Environmental Protection Agency, Defendants.**

**No. C–75–1291 RFP.**

United States District Court,
N. D. California.

March 22, 1976.

---

William D. Maer, Houston, Tex., Richard C. Brautigam, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for plaintiff.

Charles M. O'Connor, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This is a complex environmental protection action arising under the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* ("the Act"). Plaintiff Shell Oil Company has filed suit against the Environmental Protection Agency and its Administrator, Russell Train, to challenge the promulgation of administrative regulations governing the petroleum industry, and to challenge the issuance of a water pollution permit and denial of a variance from the specific regulations governing plaintiff's refinery at Martinez, California.

Presently before the court is defendant's motion to dismiss the entire action for lack of subject matter jurisdiction. From our review of the applicable legislation, we conclude that the district court lacks jurisdiction to consider any of the matters raised in plaintiff's complaint.

## I. THE FEDERAL WATER POLLUTION CONTROL ACT

Prior to 1972, the Federal Water Pollution Control Act of 1965 was keyed to a system of water standards: to enjoin a suspected polluter, the government was required to prove that water near an industrial source had fallen below the applicable standards, and that the defendant had proximately caused the deterioration in water quality. Enforcement was entrusted to the states, which were chronically underfunded and thus unable to deter or prosecute violations of the statute. As characterized by one legislator, the elaborate stat-

utory procedure never resulted in improved water quality anywhere.[1]

The 1972 legislation, while technically amending the Federal Water Pollution Control Act of 1965, in effect restructures and replaces all existing water pollution statutes. The Act establishes a comprehensive program designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" in pursuit of a "national goal that discharge of pollutants into navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a). In achieving the ultimate objective of water purity, the statute relies primarily on a permit system. The permit regulatory device requires any entity seeking to discharge pollutant to obtain a permit; the permit restricts the entity to designated maximum "effluent limitations," or "quantities, rates, and concentrations of chemical, physical, biological, and other constituents dischargeable into from point sources navigable waters." 33 U.S.C. § 1362.

Establishing a timetable for industry compliance, the Act mandates that water pollution standards become increasingly stringent, and that each pollutor be required to maintain a progressively higher degree of effluent quality.[2] Effective immediately, the statute prohibits discharge of any pollutant into navigable waters unless the polluter holds a permit specifying effluent limitations legally dischargeable. Section 402(a) of the Act authorizes the Administrator of the Environmental Protection Agency to issue such permits nationwide.[3] However, the Act contemplates a gradual decentralization of permit-issuing authority; section 402(b) of the statute authorizes a state to administer the program in lieu of the Administrator provided that the state program satisfies minimum federal criteria.[4] To prevent lax enforcement of

1. Muskie, "A Legislator's View of the Impending Amendments to the Water Pollution Control Act," 13 *B.C.Ind. & Com.L.Rev.* 629, 630–631 (1972).

2. Section 301(b) of the Act establishes a two-stage procedure: by July 1, 1977, the Administrator shall require "application of the best practicable control technology currently available;" by July 1, 1983, the Administrator shall require "application of the best available technology economically achievable." 33 U.S.C. §§ 1311(b)(1)(A), 1311(b)(2)(A). See, "Federal Water Pollution Control Act Amendments of 1972," 1973 *Wis.L.Rev.* 893 (1973).

3. Section 402(a) of the Act provides in pertinent part:

"(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting and other such requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharge into the navigable waters issued pursuant to section 407 of this title, shall be deemed to be permits issued under this title, and permits issued under this title shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter."

4. Sections 402(a)(5) and 402(b) of the Act provide:

"402(a)(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter, to issue permits for discharges into the navigable waters within the jurisdiction of such State. . . . Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

402(b) At any time after the promulgation of the guidelines required by subsection (h)(2) of

states fearing industrial relocation, the Administrator retains a veto power over all state-issued permits.[5]

On May 14, 1973, the Administrator authorized the State of California to administer a permit program for waters within its boundaries. 39 Fed.Reg. 26061. The designated state administering body is the State Water Quality Control Board ("State Regional Board"). Pursuant to a Memorandum of Understanding Regarding Permit and Enforcement Programs executed between the state and the Administrator, all permit applications are routinely transmitted to EPA's regional office in San Francisco for review and comment before decision by the State Regional Board.

## II. BACKGROUND OF THE PRESENT LITIGATION

Plaintiff Shell Oil Company owns and operates a petroleum refinery and organic chemical plant near Martinez, California ("Martinez plant").[6] In compliance with the Act, plaintiff applied to the State Regional Board for a permit to discharge polluting material into the local waters near Martinez. The State Regional Board, ap-

plying the national effluent regulations promulgated for petroleum refining,[7] prepared a proposed permit for plaintiff's refinery and transmitted a copy to the EPA regional office on October 15, 1974. With EPA approval, the State Regional Board issued a permit designating the Martinez plant a "Class E" refinery and applying the effluent limitations promulgated for Class E facilities.[8]

Since effluent limitations are formulated from evaluation of a representative sampling of petroleum refineries, and since individual refineries exist with processes fundamentally different from the sample facilities, the regulations authorize a petitioner to obtain a variance from the effluent limitations applicable to a designated category of refineries. 39 Fed.Reg. 16572. Plaintiff, contending that its Martinez facility is fundamentally different from the sample facilities used in formulating limitations for the petroleum industry, petitioned the State Regional Board on November 13, 1974, for a variance for its facility. The State Regional Board forwarded plaintiff's application to EPA's regional office on November 25, 1974, for comment. The EPA regional office wrote a letter in February, 1975, rec-

this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those states water pollution control agencies which have independent legal counsel) or from the chief legal officer in the case of an interstate agency, that the laws of such state, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist (to perform eight designated functions)."

5. Section 402(d) of the Act provides:

"(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter."

6. Plaintiff characterizes the Martinez facility as "a combination of a petroleum refinery lube oil-plant and an extensive organic chemical plant which includes approximately twenty lube chemical processes."

7. The applicable limitations promulgated for the petroleum industry were published on May 9, 1974. 39 Fed.Reg. 16560. Amendments to the petroleum industry regulations were published on May 20, 1975. 40 Fed.Reg. 21939.

8. The guidelines applicable to petroleum refineries divide refineries into five subcategories, A through E. 39 Fed.Reg. 16560, 40 Fed.Reg. 21939. Plaintiff contends in this litigation that its Martinez facility should properly be designated a Class D refinery. Complaint, ¶ 24.

ommending denial of plaintiff's application. Following a public hearing on plaintiff's permit, the State Regional Board denied the requested variance.

Plaintiff filed the present action on June 20, 1975, against defendants EPA and Russell Train; no state officers are joined as defendants. Plaintiff alleges that although the State Regional Board has formal authority to issue permits, and did technically issue the Martinez permit and deny the petition for a variance, the Administrator "made all the material decisions" and the State Regional Board functioned as a rubber stamp for the federal decisions.

Plaintiff's complaint attacks application of the Federal Water Pollution Control Act to the petroleum industry generally and to the Martinez facility specifically:

1. Plaintiff claims that the effluent regulations promulgated for petroleum refineries [39 Fed.Reg. 16560 and 40 Fed.Reg. 21939] are beyond the scope of the Administrator's statutory authority, are based on invalid methodology, and are formulated in disregard of statutory factors.

2. Plaintiff claims that its Martinez facility should properly be designated a Class D and not a Class E refinery, or, alternatively, that plaintiff should be granted a variance from the Class E effluent limitations.

Plaintiff seeks a judicial declaration invalidating the effluent limitations promulgated for petroleum refineries and further seeks an injunction ordering the Administrator to issue plaintiff's Martinez facility a Class D permit, or, alternatively, ordering the Administrator to grant plaintiff a variance from the Class E effluent limitations.

## III. DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION

Concurrently with the present action, plaintiff filed similar challenges to the Administrator's determinations in two other tribunals: the Ninth Circuit Court of Appeals[9] and the California Regional Water Quality Control Board.[10] Defendants moved to dismiss the petition in the Court of Appeals. On September 22, 1975, the Ninth Circuit, granting defendants' motion, issued the following order:

(a) The petition for review is dismissed as to the first four issues raised therein [challenging the permit issued to the Martinez facility and the request for a variance] on the ground that the February 18, 1975 decision by the California Regional Water Quality Control Board was not an act by the Administrator of the Environmental Protection Agency such as would give this Court jurisdiction under Section 509(b)(1) of the Federal Water Pollution Control Act [33 U.S.C. § 1369(b)(1)]; and

(b) the fifth and last issue raised by the petition for review [challenging the effluent regulations promulgated for the petroleum industry] is dismissed on the ground that the petition was not timely filed as required by 33 U.S.C. § 1369(b)(1).

The interpretation of this order—which of course controls our decision in the present case—is vigorously disputed by the parties. Plaintiff contends that denial of jurisdiction by the appellate court necessarily implies that review of agency action lies in the district court under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Defendants contend that: part (a) of the circuit court order establishes that no federal forum has jurisdiction over the permit and variance processes, which were entirely controlled by state officials; and part (b) of the circuit court order holds that jurisdiction to review effluent regulations is properly in the appellate courts, but that plaintiff's challenge in the present case was untimely.

9. *Shell Oil Company v. Russell E. Train and Environmental Protection Agency,* No. 75–2070.

10. Case No. A–99.

A. Jurisdiction to Review Effluent Regulations Promulgated for the Petroleum Industry

In determining the proper forum for review of regulations promulgated for the petroleum industry [39 Fed.Reg. 16560, 40 Fed.Reg. 21939] our inquiry commences with the judicial review provision of the Federal Water Pollution Control Act. Section 509 of the Act states:

(b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342 of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance, or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
33 U.S.C. § 1369.

In determining the scope of circuit court jurisdiction over water pollution control, the courts have divided on the issue of review of regulations promulgated by the Administrator. The source of the controversy stems from the legislative ambiguity concerning the precise statutory authority for promulgation of effluent regulations: do the administrative regulations constitute "effluent limitations" within the meaning of section 301[11] of the Act, or do they constitute "effluent guidelines" within the meaning of section 304[12] of the Act? Determination of the Administrator's authority is a necessary prerequisite to resolution of the jurisdictional issue, because section 509 expressly includes section 301 and conspicuously omits section 304 among the statutory enumeration of reviewable items. Therefore, if the Administrator's power to promulgate regulations stems from section 301 of the Act, the regulations are subject to circuit court review; if the Administrator's authority to promulgate regulations stems from section 304 of the Act, the circuit courts are expressly stripped of jurisdiction, which arguably lies in the district courts under the Administrative Procedure Act. In resolving this issue, the courts have agreed only that the statute is ambiguous, and have disagreed in "deciphering the legislative intent from reading scraps and bits of a convoluted legislative history." *Ameri-*

11. Section 301(b) of the Act provides in pertinent part:
"(b) In order to carry out the objectives of this Act there shall be achieved—
(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act . . . . .

(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources other than publicly controlled treatment works, which (i) shall require application of the best available technology economically achievable . . . as determined in accordance with the regulations issued by the Administrator pursuant to section 304(b)(2) of the Act." 33 U.S.C. § 1311(b).

12. Section 304(b) of the Act provides in pertinent part:
"(a)(1) the Administrator . . . shall develop and publish . . . criteria for water quality . . .
(b) For the purpose of adopting or revising effluent limitations under this Act the Administrator . . . shall publish . . . regulations providing guidelines for effluent limitations. . . . Such regulations shall—
(B) specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 301 of this Act . . . ." 33 U.S.C. § 1314.

can Iron and Steel Institute v. EPA, 8 E.R.C. 1321, 1346 (3d Cir. 1973) (Adams, J., concurring).

Of the eight courts which have considered the issue, only one has concluded that the Administrator's authority to publish discharge regulations stems from section 304, and that jurisdiction is therefore vested in the district courts. CPC International, Inc. v. Train, 515 F.2d 1032 (8th Cir. 1975). Against CPC is marshalled an array of opinions which have concluded that the Administrator's authority to promulgate regulations is grounded in section 301 or in a combination of sections 301 and 304; in either case, jurisdiction to review administrative regulations is vested in the Court of Appeals. E. I. duPont de Nemours and Company v. Train, 528 F.2d 1136 (4th Cir. 1975), aff'g 383 F.Supp. 1244 (W.D.Va. 1974); American Petroleum Institute v. Train, 526 F.2d 1343 (10th Cir. 1975), aff'g 7 E.R.C. 1795 (D.Colo.1975); American Meat Institute v. Environmental Protection Agency, 526 F.2d 442, 8 E.R.C. 1369 (7th Cir. 1975); American Iron and Steel Institute v. Environmental Protection Agency, 8 E.R.C. 1321 (3d Cir. 1975); American Paper Institute v. Train, 381 F.Supp. 553 (D.D.C. 1974).

From our review of the case law, we have concluded that the majority position is sound. The decisions supporting appellate jurisdiction have pointed out the anomalous results which would flow from adopting plaintiff's contention that review of the Administrator's regulations is vested in the district court. First, jurisdiction to review regulations would be fragmented between the district and circuit courts: regulations governing existing sources would be reviewable in the district court, while regulations governing new sources would be reviewable in the circuit courts. 33 U.S.C. § 1316.[13] Second, under plaintiff's interpretation of the statute, individual permits

would be reviewable in the appellate courts, 33 U.S.C. § 1342, while the industrywide national regulations on which the permits were based would be reviewable in the district courts. American Meat Institute v. EPA, 526 F.2d 442, 8 E.R.C. 1369 (7th Cir. 1975). This fragmentation of judicial authority would reinject into water pollution control the cumbersome procedures which the 1972 amendments were designed to eliminate.

■ We note also that the water pollution control amendments—together with other environmental legislation enacted during the early 1970s—were passed in a climate of legislative urgency. The express intent of both the Federal Water Pollution Control Amendments and the Clean Air Act, 42 U.S.C. § 1857c-5, was to streamline decision-making and ensure prompt high-level judicial review. American Iron and Steel Institute v. EPA, 8 E.R.C. 1321 (3d Cir. 1975); American Meat Institute v. EPA, 526 F.2d 442, 8 E.R.C. 1969 (7th Cir. 1975); E. I. duPont de Nemours and Company v. Train, 383 F.Supp. 1244 (W.D.Va. 1974), aff'd 528 F.2d 1136 (4th Cir. 1975). This legislative policy indicates a congressional determination to vest jurisdiction over discharge regulations in the circuit courts.

■ Finally, we heed the Supreme Court's repeated admonition that where a statute is fairly susceptible of conflicting interpretations, the construction adopted by the agency charged with its administration is entitled to deference. Train v. NRDC, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731, 43 U.S.L.W. 4467 (1975) (upholding Environmental Protection Agency interpretation of Clean Air Act). See also: Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1966); Power Reaction Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

---

13. The practical difficulty of such a division of judicial business is illustrated in E. I. duPont de Nemours and Company v. Train, 528 F.2d 1136 (4th Cir. 1975): "Assume that an existing plant licensed under the Act expands. It is possible that the expanded portion of the plant would constitute a new point source within the meaning of § 306. In that event, the plant could be compelled to maintain two actions simultaneously, one in the district court and another in the court of appeals." At 1141.

We conclude therefore that review of the challenged regulations governing the petroleum industry is properly in the Court of Appeals, and further conclude that the Ninth Circuit implicitly adopted this construction in its order of September 30, 1975. The court dismissed plaintiff's challenge to the petroleum regulations on the ground that the petition was not filed within the statutory 90-day limitations period; [14] if the Ninth Circuit had declined jurisdiction on the ground that review was properly in this court, it would surely have so stated.

B. Jurisdiction to Review the Permit Issued to the Martinez Facility and Denial of Plaintiff's Petition for a Variance

Plaintiff's second major attack in this litigation is against the specific decisions governing the Martinez facility—the issuance of a Class E permit and the denial of plaintiff's petition for a variance from Class E regulations. Both orders were issued by the State Regional Board; however, plaintiff claims that the federal EPA exercised tight control over the decision-making process and that the state agency merely rubber-stamped the federally-dictated rulings. Accordingly, claims plaintiff, jurisdiction to review these actions lies in the district court. We disagree.

While the allocation of authority between the state and federal governments might have been more clearly delineated in the Act, the legislative history indicates a basic Congressional policy of preserving the primary role of the states in controlling water pollution. The Senate Report states:

Against the background of the Clean Air Act and the Refuse Act the Committee concluded that the enforcement presence of the Federal government shall be concurrent with the enforcement powers of the States. The Committee does not intend that this jurisdiction of the Federal government to supplant state enforcement. Rather the Committee intends that the enforcement power of the Feder-

al government be available in cases where the States and other appropriate enforcement agencies are not acting expeditiously and vigorously to enforce control requirements.

.    .    .    .    .

The Committee intends the great volume of enforcement actions be brought by the States.

Senate Report (Public Works Committee), No. 92–414, October 28, 1971, U.S.Code Congressional and Administrative News 92 Congress, Second Session (1972), pp. 3668, 3730.

This language suggests that Congress did not intend the environmental effort to be subject to a massive federal bureaucracy; rather, the states were vested with primary responsibility for water quality, triggering the federal enforcement mechanism only where the states defaulted. One commentator, characterizing the state-federal relationship as a "partnership," noted: "The overall structure is designed to give the states the first opportunity to insure its proper implementation. In the event that a state fails to act, federal intervention is a certainty." McThenia, "An Examination of the Federal Water Pollution Control Act Amendments of 1972," 30 *Wash. & Lee L.Rev.* 195, 206 (1973).

In the present case, the state did not fail to act: using its own personnel and apparatus, the State Regional Board acted on plaintiff's application for a permit and for a variance. The state requested and received advice from the regional office of the federal Environmental Protection Agency; however, we do not believe that this advice rises to the level of behind-the-scenes coercion charged by plaintiff. It is true that the Administrator of the federal Environmental Protection Agency has authority to veto any permit which fails to conform to federal standards. 33 U.S.C. § 1342(d). However, it is a logical leap to

14. 33 U.S.C. § 1369(b)(1). The challenged regulations were promulgated on May 4, 1974; plaintiff filed its petition over a year later, on May 14, 1975. A timely petition challenging the identical regulations governing the petroleum industry was filed in the Tenth Circuit. *American Petroleum Institute v. Train,* 526 F.2d 1343 (10th Cir.).

equate the federal failure to veto with federal control sufficient to invoke federal jurisdiction. If the federal agency *had* exercised its veto power, there would have been federal action reviewable in a federal forum; however, the mere failure to disapprove a state administrative action cannot be deemed decision-making by a federal body.

Moreover, we think that the Ninth Circuit's order of September 30, 1975, is quite explicit on this aspect of the litigation. The court held that the "decision by the California Regional Water Quality Control Board was not an act by the Administrator of the Environmental Protection Agency such as would give this Court jurisdiction under Section 509(b)(1) of the Federal Water Pollution Control Act." Plaintiff's interpretation of this order as vesting jurisdiction in the district court is untenable; section 509 of the Act expressly provides that where review of the permit-issuing process is in the federal courts, jurisdiction is vested in the Courts of Appeals. 33 U.S.C. § 1369(b)(1)(F). Thus, the Ninth Circuit order clearly holds that no federal action was involved in the Martinez permit or variance, and that review of the State Regional Board's determination is properly in the state tribunals.[15]

### IV. CONCLUSION

Under the Federal Water Pollution Control Act, the district court lacks jurisdiction to review any of the administrative determinations challenged in plaintiff's complaint. Our ruling does not leave plaintiff remediless: plaintiff may pursue its challenge to the petroleum regulations in the Tenth Circuit, and may pursue its challenge to the Martinez permit and variance determinations in the state tribunals.

Accordingly, defendants' motion to dismiss this action for lack of subject matter jurisdiction is granted.

IT IS SO ORDERED.

---

**15.** Plaintiff is entitled to challenge the Regional Board's decision in the State Board. Cal. Water Code § 13320. From the State Board's decision, plaintiff may appeal to the California Superior Court. Cal. Water Code § 13330.